So we have Moody v. Atlantic City and is it Mr. Dion? Yes, your honors. Senator Dion here for the appellant, Michelle Moody. I'd like to reserve two minutes for rebuttal. Very good. And thank you very much for hearing the argument today. It was a little hard to decide where to begin the oral argument today. You can start with the questions. Tell us how we get by the supervisor issue. Well, very simply, Mr. Marshall, the foreman, had the power to either grant hours or not grant them at all. So Ms. Moody would not be working at that school or possibly not at all unless he gave her hours. So there's no greater power than to allow a person to work. So you would say when we look at Vance that that power, as you say, that Marshall had was a significant change in benefits, so therefore it had to be a tangible employment action? Correct. Does that mean that anybody who controls the schedule for a workforce would be a supervisor? Yes. If you have the power to schedule a person, but, well, I know what you're referring to, Your Honor. You're referring to maybe a dispatcher or something or a scheduler. We're talking about this person had the sole power at that school to give hours or not. There was no rotation. There was no guarantee of hours, but there was no rotation set up by the school district. So the only way that Ms. Moody could get any hours was to go around and talk to all the individual supervisors, basically like a job interview. Did she have 10 supervisors? No. 11 supervisors? No. Well, there were. There were supervisors at all the school or there were these people at all the schools who could give her hours or not give her hours, correct? There was no guarantee of that. Doesn't that make each of these people a supervisor if they can withhold hours or give hours? Your Honor, the supervisor is the person that is going to actually give you the hours. She wasn't even on the radar of the other. Let me give you a hypothetical that goes to this point, okay? So I think the point that Judge Rendell is getting to is the following. Yes. She's told by management, go see the custodial foreman, right? She goes and sees them, right? Yes. In my hypothetical world, you know, we love you. We're going to give you as many hours as possible. So number one gives her five hours, number two, 10 hours, number three, and so on, right? Yes. Then the question is in that hypothetical, are each of those 10 custodial foremen her supervisor? I would say yes. Whoever is giving her hours at the time has those powers, the tangible employment, to take a tangible employment action. How do you fit that into Vance? Find language in Vance that would help you say, ah, this is the clear line that we're drawing. It's been nebulous and murky before, but now we're going to easily find that that person is the supervisor. So what language in Vance helps you? The significant change in benefits, which came from Farringer, Ellerith. Significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. Right. So that's where we get it from, the ability to make a significant change in benefits. It's the same reasoning that was used in. But isn't it that if you're saying all these people are supervisors, aren't we looking at the nebulous, you know, there's no empowerment here by the board. And isn't that really what Vance is all about, that someone has been empowered to impact the employee in this way? And if they say, you know, Justice Alito says supervisory status can usually be readily determined, generally by written documentation. You've got the power to hire, fire this person. You're going to dock their pay. Significant change in benefits. Does that really fit with the fact that you're saying there are 10 or 11 supervisors here? The Supreme Court never limited it to hiring and firing, which that was the basis of the lower court decision. But isn't this tantamount to hiring and firing when you're the one giving the hours? You're the one conducting an interview and saying, okay, now I'm going to start giving you hours, Your Honor. And then you're the person that's actually giving the hours. So you're, in a sense, the actual hiring that occurred was, okay, she's available to be a substitute, but she's not going to get any work until she interviews with this foreman at the school. And, in fact, somebody at the board told her, if you want to get hours, you've got to go to the board foreman. Is that right? Correct. So is it your position, then, that the board foreman, because they controlled who got assigned hours and hence resulted in pay or who didn't get assigned hours and then got no pay, is the nature of the benefits that Vance was speaking of for a change? Yes. And, in fact, Your Honor, what he mentioned, the administration itself was acknowledging that, hey, you've got to go over to the foreman and get the hours. We're not going to do anything for you. Is there anything in the record that identifies someone else providing supervision to the folks like Ms. Moody? No. That year she got some hours over at Pennsylvania School. But there's nobody else. There was no person identified in the record above the foreman who was her superior. Is that correct? Mr. Caldwell was the administrator and he was the supervisor for the foreman. Is that somewhere in the record? It is in the record. And so tell us a little bit about Caldwell's role. Was he at Marshall School? No. Caldwell was in administration. Okay. So Mr. Caldwell is the person who took the old complaints about Mr. Marshall and he's the one that ultimately promoted Mr. Marshall to the role, despite multiple complaints of other types of harassment against other employees. So he promoted Marshall, you're saying, but does that say that he was Moody's supervisor? He gave full reign to the foreman that he supervised to schedule the- To schedule, but not to hire and fire. Right. He had no role in scheduling. But are you saying if I'm an attorney in a law firm and there's four different people who are giving me work, that they're going to enable me to have 2,000 hours or maybe 1,000 hours that's going to impact my review and how I do these or all my supervisors? In a sense, yes, Your Honor. You have to look at the specific facts of each case. Well, see, that's going to be a problem. Yeah. Because that's what Vance doesn't want you to do. He doesn't want to look at the specific facts of each case. They're going to say this is clearly a person that has been empowered by their employer to hire, fire, or do a significant change in benefits. Why would you run away from that great example, right? A law firm is a perfect example. Each one of those four partners can ditch you if you stink. That's probably the best word that I can use. And you'll be gone. It doesn't matter how many supervisors you have, Your Honor. They all have certain powers. They all have the same power in this case. Each one had the same power. But ultimately, the power that Mr. Marshall had, he was able to wave that around and use that to get his way. Now, that has to do with the hostile work environment claim. Yes, Your Honor. And clearly there is an issue there. And I don't think we're going to resolve it at this moment. But talk about the quid pro quo claim and the retaliation claim. I mean, the judge granted summary judgment on all of these. Why would you say that quid pro quo should not have been granted? Did you preserve your quid pro quo claim? Well, I understand that there is a quid pro quo claim, obviously. But when we went with the hostile work environment claim, and the quid pro quo is so outrageous that we felt that it added to the hostile work environment. Obviously, when you offer a person to give them hours in exchange for sexual favors, that is harassment and it creates a hostile work environment. I don't really see the difference between taking a position in this hostile work environment as opposed to saying quid pro quo here. Well, there are differences, though. The consequences on the availability of Albuquerque defense, whether McDonnell Douglas applies to one versus the other. So I think what Judge Greenwood was driving at is your claim, the hostile work environment claim. That's how your brief repeats. That's what we claimed. I would never say I would give up any claim. But if you lose on supervisor status, your hostile work environment claim goes away. Can we be more basic? How about like your colleagues, did you preserve your quid pro quo claim? And if so, tell us how, and then we can talk about the substance of each of those claims because my colleagues obviously are right, there are certain idiosyncrasies with regard to each claim that we then would get into. Right. Well, there was a, you know, the facts indicate that after Ms. Newdy had, after they engaged in sexual relations, I guess it was December 27th, Ms. Newdy then indicated that her hours were reduced. And at that point, that could be deemed a tangible employment action at that point. My question is whether the facts support it. My question is much more basic. Okay. My question is, did you state it? Is it in there? Have you argued it on appeal? No. I feel that I wasn't, that wasn't the point I was trying to make. That's okay. Yeah. So we have two claims, right? I don't want to give up the claim, but I wasn't prepared to argue that. Well, it's not an argument on appeal. Let's concentrate on what I argued. Okay. So we've got two claims. Is that right? We've got two claims, hostile work environment, and then we have retaliation. Right. And, obviously, the respondent, their argument was, let's just assume this person isn't even a supervisor and talk about all these old cases where we're treating this person like a co-worker. So, you know, if you agree with me that Mr. Marshall was a supervisor, then that claim should have ended right there. That should have been, that part of the summary judgment motion should have been denied. You mean, ELIF isn't available if it's, right, again. And then it was the lower court that raised the issue of going into Vance. So what I'm trying to say is that the respondent never argued that the reason why he wasn't a supervisor. He just assumed it, if you look at the brief. And, also, I'd like to point out that the Farringer-Ellerith defense was not reserved in the answer to the complaint. You can see on page DA60, I believe it is, DA60 and 61. Just to let you know. But, in fact, if you look at the answer, maybe Ellerith-Farringer words weren't used, but there are two paragraphs in the complaint that seem to map on to Ellerith. One is, if I were to mitigate, which other courts have concluded preserve a piece of it, and the other is that they engaged in a reasonable process. So are you sure it wasn't preserved? I'm thinking it wasn't, Your Honor. And, back to Judge Riddell's question, how would you prejudice by it? Certainly the summary judgment opening brief made reference to facts that map right on to Ellerith-Farringer. So how would you prejudice? Well, let's assume that what you're saying is correct, Your Honor. Then I'm going to withdraw that notion. I just wanted to let you know that I didn't see any affirmative defense. I understand your position. Thank you. All right. Thank you very much. Thank you. Thank you. Good afternoon, Your Honors. Rachel Conti from the Law Offices of Riley & Riley on behalf of the Atlantic City Board of Education. Your Honors, I represent the Board in this case, and it's our position, and it has been our position since we filed the motion for summary judgment, that this case is about what the Board knew when they knew it and what they did about it. Well, you don't back away from the notion that it was someone in management who told her, if you want more hours, you've got to go see the custodial foreman, right? Yes, that's in the record, Judge, and I believe that she testified that's exactly what she did. She went to each of the schools. There were 11 schools in the Atlantic City School District at the time. So when somebody tells you from a position of authority that's the only way you want more hours, that's the only way you're going to get more hours, isn't that essentially an admission that those people are her supervisors? Because those people are now going to control whether you get work or not, and isn't that the essence of what significant change in benefits means? Well, I think that for Moody to have gone to each of these 11 custodial foremen, I don't necessarily think that that makes them a supervisor, and it's the Board's position that Maurice Marshall is not her supervisor. Well, you don't even cite Vance in your brief. That's correct, Your Honor. That was the very first, and if it was an oversight in recent case law, I apologize to the court, but certainly when we went into, just for the record, to give Your Honor some background, our firm came in at the 11th and a half hour into this case, and actually the deadline for dispositive motions had already come and gone. There was some last-ditch effort, I believe it was Judge Schneider who extended the deadline for dispositive motions in a last-ditch effort to retain some of the text messages that plaintiff said that she had. Nonetheless, we did eventually get the opportunity to file a dispositive motion. In attacking how to prepare the defense and what kind of research to do and what cases to cite, obviously we start with the complaint. In the complaint, it wasn't clear what theory of sexual harassment of Title VII plaintiff was even claiming, but either way, you still need a supervisor for the Board to be liable. Agreed, and Judge, I think that we cite that in our opening brief to summary judgment. We discuss both types, both forms, the hostile work environment and the quid pro quo. But in terms of a supervisor, if it wasn't Forman, if it wasn't Mr. Marshall, who was it, based on the record? I think in reflecting on how we were going to discuss this today, I think that it's reasonable that if Moody was called in by Marshall that day, and Marshall was the foreman at the school in charge of all the custodians, I think that it's reasonable that during that day he could be considered in the supervisory position. However, was he a supervisor, her supervisor there? No, I think it would have been the principal. There's nothing in the record that says that, correct? We have nothing in the record that would educate us as to who the supervisor is if it wasn't Mr. Marshall, correct? Actually, Mr. Marshall testified during his deposition that he doesn't have the power to hire or fire, he doesn't have the power to promote, and he testified that it would be, in terms of contracts, if Moody wanted a contract at one of the schools, that it would be the principal. We all read the deposition. Here's the question. In Vance, it talks about significant change in benefits, and the question is if Marshall, for a period of time, is the sole person controlling what hours that Moody received, and Moody acted on the advice of someone of a higher authority, who, based on the record, could be her supervisor other than Marshall? Well, then I think the answer would be Barry Caldwell, the director of operations, who's in charge of all of the custodial foremans at the school. That's her supervisor, a person who has nothing to do with the hours that she's assigned. Well, I think it's important to keep in mind that Miss Moody was a substitute custodian and testified, obviously, that she had no reasonable expectation to hours. There was never any guarantee. That's not the question, right? The question is, did Caldwell, you've mentioned he's a supervisor, did he have any control over her hours? Did he say, you're going to work in New York today, or you're going to work in Pennsylvania, or any of the other schools? No, I think Caldwell delegated that responsibility, that sole responsibility, to the custodial foreman at each of the schools. To all of them. Yes. So each of them, and it could be if Marshall cut way down on her hours, she goes to custodian at XYZ school or Y school and says, listen, I've done a really great job for Marshall. He's not giving me hours. You give me hours. And the guy gives her 50 hours. So just by virtue of the serendipity, if you will, of whoever is assigning her, and gives her more or less, we call that significant and supervisor. Is that where that would take you? Well, yes, I think I agree with that, Judge. I think that the Vance case advances LIRTH. Obviously, I've read the Vance case in anticipation of today. But I think that in LIRTH, I think Vance stands for supervisors. We're going to make a supervisor what was framed in the LIRTH case. But in Vance, the person in Vance, right, who is the subject of the plaintiff's ire, is not a person who controlled her day. You know, they did some things here and there, but it wasn't a person who had ‑‑ and correct me if I'm wrong, Marshall had control over what hours she got. And, in fact, if you go along with the allegations as averred, it was colloquially, to put it colloquially, you know, if you hook me up, I'll hook you up. So, I mean, what could be more focused on a significant change in benefits? I think that I would not agree that Marshall had the ability to take a tangible employment action on Moody because there were 10 other foremen, 10 other schools that she could work at. And I think that LIRTH points out if the tangible employment action is substantial enough that the employer would ultimately be put on notice that this is going on, that's my point. So, the hours that one works, giving out hours, in your view, is not a significant change in benefits? Not in this case. Okay, what is a significant change in benefits? Forget about this case. Just tell me, what is a significant change in benefits? Well, I think that it's important to keep in mind in this case, and I know you just said not in this case, but in this case there were no guarantee of hours. There was no benefits. You can say that about any at-will employee. I can't say that about me, Article 3. But about almost any other person that we come across in the work world is an at-will employee. So, nobody has any guarantees. But help me now with my question. What is a significant change in benefits? I think that if you have a full-time position or a contract or a part-time position or some kind of articulated job title or some kind of expectation that has been laid out by your employer and something with what has been laid out for you, that this is your job, changes, then I think that that's a tangible employment action. Well, let's look at the payroll records just in this case. If we look at the amount of hours she had in the, whether we do three pay periods or three months, before she rebuffs his overtures, and we look at afterwards, there is a massive reduction in time. So, on a summary judgment record, that is a reasonable thing for a juror to have concluded there was a tangible economic action taken towards this person. So, on a summary judgment record, if we want to talk about this case, I don't, are you saying that it doesn't reflect a significant change in benefits when you go from, you know, 300-plus hours to 70 hours or whatever the precise numbers are? Well, Your Honor, I've gone through all of the payroll records, obviously, and I see that after she made her report, well, after she alleges to have declined his advances and after this encounter that they had in December of 2012, she still received the first pay period, 38.5 hours. But she had like 60-something hours right afterwards in those three weeks. And then she comes, tries to pick up her check, sees another female substitute foreman. All of a sudden, there's no more hours for a chunk of weeks and then to get some hours. But I guess my question is, because this is a summary judgment case where you have a construction of the records which could totally support your view, that even after she rebuffed him, she continued to get hours from him, no problem. Couldn't really have been that hostile. Now, your adversary is saying he's not pursuing a quid pro quo claim anymore, so the relevance of that immediate reaction may be questionable now. But my point is, how do we get by summary judgment? How does this get past summary judgment given the fact that there are two reasonable ways to look at the time records to show there's been a tangible employment action? Because I assume you agree that a reduction in hours, a three-fold reduction in hours, would be a tangible employment action. I would if there was a guarantee for hours in the first place. Where are you coming up with this guarantee language? Where does that come from? Because in the testimony, in her deposition testimony... No, no, no, as a matter of law, we're talking about law. Right, right. So, therefore, you must be deriving it from somewhere. Please just tell us, are you getting that from Vance? Are you getting it from Ellert? Are you getting it from Cotton? Cotton certainly wouldn't say that, right? No, Judge, I don't think that I have a case that I'm getting that from. I think I'm being very case-specific with our case, and in terms of Moody's expectation of hours to begin with. Well, then, let's just start with one proposition. Can we agree or disagree with Judge Swartz's proposition that you would agree that if there were a decrease in hours, that that would be problematic and present a genuine dispute of fact? Jess, do you agree with that proposition? I probably would, but in this case, if you keep going, I don't see a decrease in hours or a decrease in pay. I think that even up until the next May of 2013, she's still getting hours, and that's as far as our records go. Isn't the issue that what are the benefits to which she is entitled? I think that's a fair question. The benefit to which she is entitled, she's not promised a 40-hour work week. She's not, I mean, I think that's the starting point. What is the benefit to which she's entitled? There really isn't a benefit to which she's entitled. I mean, if she's making $5 an hour and someone reduces her pay to $2 an hour, it's a significant change in benefit because the benefit promised was $5 an hour. Here, the change in benefit, granted there's a decrease in work, but can you say there is a substantial change in benefits when there's really no benefit starting point? I think that's the point we tried to make in our briefs, and what we're alluding to is that there was, she even acknowledged and she testified that she never, she was told there was never going to be a guarantee. When Mr. Marshall was deposed, he testified that he would call, it was a list, it was a pool of people, and some people would accept for that day, some people wouldn't. Moody even testified for the first two years she didn't accept any of the employment assignments because of child care issues. So I think that there wasn't a benefit to begin with. If there is an issue of fact about whether there was an adverse or tangible employment action, I'm turning your direction to Elmer Fowler for a second. If there's a disputed fact on that subject, whether there was or was not an adverse action, doesn't that issue need to be resolved before we can even determine whether you're eligible for the ELRITH defense? Because that defense only applies if there's no tangible action. So don't we have to have that issue of fact resolved, if there were an issue of fact? And then the next question would be, if tangible employment action, ELRITH not available to your client, if there is no tangible employment action, then the ELRITH factors could apply. So don't we have a potential, aren't we stuck somewhere in the thought tree, if there's an issue of fact on whether there was a tangible employment action? I understand the question. I would say no. I mean, I represent the board, and I think that with the defense that's available to the board as the employer, they had anti-sexual harassment policies in place. That's part of the record. The second prong is, did the employee do anything? It's undisputed. She told no one. But if there was a tangible employment action, then there's strict liability, right? We don't even get to ELRITH factor. So isn't that a great question? It's a great question of why that we're asking. And we're looking at these charts, these ELRITH charts, and it's tough to figure out. Was there a tangible employment action? What are we looking at? Are they apples and oranges of whether she got more work or less work? Do we look year to year? Do we look three months? The tangible employment action is a thorny one. And don't we need to decide that? Yes, and it's always been our position that even as a matter of law, look at this record. It can't be negated based on the payroll records that were set forth, based on the timesheets that were set forth, and based on the deposition testimony of her understanding of what her benefits were that she was entitled to, that there was no tangible employment action. And I notice my time is red, but I'd be happy to answer any other questions. Good. Thank you so much. Thank you, Your Honors. All right. Your Honor, I'd just like to comment that the expectation was expectation to get substitute work and hopefully get as much as possible. There are many part-time employees. But was that the benefit to which she was entitled? What was the benefit to which she was entitled that your contending was changed? She was fairly given hours based on the fact that she was employed as a substitute. And there are many employees throughout the country that are part-time. They don't have definite hours. And just like any employee at will, the employer can give or not give hours. Her expectation was to receive as many hours as possible. Is her expectation relevant for our consideration? That's what I'm arguing, Your Honor. I think that expectation, if you are hired to work 40 hours a week, your expectation is to work 40 hours a week. If you're hired to get as much substitute work as possible, that's your expectation. That's part of the contract. That's part of the agreement. Well, but you're saying it's a matter of contract. But there wasn't a contract here as to what she was going to get hours-wise. There really is an employment, but I don't think Vance anticipated this situation, Your Honor. We can't leave these people out to hang out to dry. If a person doesn't have definite hours, they're still entitled to protections from their supervisors in a sexual harassment context. So I think that needs to be taken into consideration. Maybe this isn't going to have to be based on Vance's decision. Maybe this is a new area. But we still do have quid pro quo and retaliation that are not based upon supervisory liability. So, I mean, there is protection. Right. And just to touch on that, you said tangible employment action. Well, can't we leave that up to the jury to decide whether or not there's a tangible employment action here? Well, that's the issue. That's why summary judgment maybe shouldn't be granted because there is a genuine issue. Exactly, Your Honor. We have the facts. 5.77 hours after the complaint average. Before, it was over 20. Leave it up to the jury to decide whether that's a tangible employment action. All right. Thank you so much. Thank you. And, Counsel, thank you very much for a well-argued case. We'll take the matter under advisement. And I believe we are at the end of this.